[Civ. No. 51403. First Dist., Div. One. June 24, 1983.]

ERVIN L. QUINN, Plaintiff and Appellant, v.
COLIN MARTIN WARNES, Defendant and Respondent.

**COUNSEL**

Elster S. Haile for Plaintiff and Appellant.

L. Christian Spieller and Gassett, Perry & Frank for Defendant and Respondent.

## OPINION

**HOLMDAHL, J.**—Plaintiff and appellant Ervin L. Quinn, who obtained a judgment in Santa Clara County Superior Court against defendant and respondent Colin Warnes, appeals from its order allowing respondent a lien against the judgment.

We affirm the order allowing the lien.

### *Statement of Facts*

The parties were involved in an automobile collision, which occurred on March 14, 1977, while appellant was acting in the course and scope of his employment. He received from El Dorado Insurance Company (hereafter, El Dorado), his employer's worker's compensation carrier, compensation benefits for temporary disability ($2,750) and medical benefits ($1,448.30), totalling $4,198.30.

After appellant filed his complaint against respondent, El Dorado filed its notice of lien claim in the action, requesting reimbursement of its payments. Thereafter, respondent filed his answer, denying the allegations in the complaint and alleging negligence on plaintiff's part.[1]

At some time during 1978, El Dorado became insolvent, and the insurance commissioner was appointed as liquidator of the company.

The action was referred to an arbitrator who awarded appellant $18,308.30 as damages. Respondent rejected the award.

Before commencement of the jury trial of the lawsuit, respondent and his liability insurance carrier, United Services Automobile Association (hereafter, U.S.A.A.), purported to take an assignment of El Dorado's lien claim in exchange for payment to it of $2,099.15 by U.S.A.A., precisely half the "face amount" of the lien.

The document evidencing the assignment was apparently prepared by respondent's attorney, who signed it on May 6, 1980. It was signed by El Dorado representatives, on May 8 and May 29, 1980. It is not clear from the assignment whether appellant or his attorney was aware of it prior to the trial.

Trial itself commenced on May 27 and the next day, prior to the receipt of any testimony, the trial judge and the parties' attorneys held an *in camera*

---

[1]It appears that no claim was made that appellant's employer was negligent in any manner.

discussion. Among other things, respondent's attorney mentioned the fact that he had negotiated a settlement with El Dorado, which consisted of purchase of the lien for 50 percent of the lien amount. The parties then agreed upon the lien amount as being the amount of the bills incurred, and that two questions would be resolved prior to entry of judgment: (1) Whether there had been, in fact, a proper assignment of the lien claim to respondent; and, (2) if so, the amount by which any judgment for appellant must be reduced by virtue of the lien claim.

At trial no mention was made to the jury of payments by El Dorado to or for appellant nor was any mention made of the assignment. The jury returned a verdict in favor of appellant in the sum of $13,808.20. The assignment was filed with the court on June 3, 1980, and judgment on the verdict was entered on June 20, 1980.

On July 3, 1980, respondent filed a motion for an order allowing as a set-off against the judgment the full amount of the lien. After a hearing on the motion, the court ordered that respondent and U.S.A.A. be allowed a set-off or credit against the judgment of $4,198.30, the full amount of the lien.

Appellant thereafter filed his notice of appeal.

### Appellant's Contentions Generally

Appellant raises a dozen or so points, but characterizes the issues on appeal as follows: (1) The purported assignment of the compensation lien to the respondent's liability insurance company is an unfair claim settlement practice; (2) there was not a legal assignment of the compensation lien claim, valid under the law; and (3) public policy considerations invalidate the purported assignment of the compensation lien.[2]

---

[2]It is not clear what appellant hopes to gain from this appeal. He seems to be asking for one of two things: (1) Invalidation of the assignment in its entirety, or (2) modification of the order so that respondent gets a set-off in the amount he paid for the lien, rather than its "face amount."

But if the assignment is invalidated in its entirety, it would seem that the lien itself would remain in existence, for the benefit of El Dorado or its creditors. If so, appellant's net judgment would be *increased* by $2,099.15, and respondent would get back his (i.e., U.S.A.A.'s) $2,099.15 from El Dorado. El Dorado would then get its full $4,198.30 from appellant's recovery, thus *reducing* it to exactly the same net amount as before, unless he is entitled to a portion of the liened amount as and for attorney fees. This latter point is discussed later herein.

On the other hand, if respondent is given credit only for half of the lien amount, what happens to the other half? Does it go to appellant? Or, should it go to El Dorado? If the former, then appellant has gotten a double recovery, by the expropriation of the fruits of the calculated risk respondent took when he purchased the lien rights. Such a double recovery may be of the type which violates *Witt v. Jackson* (1961) 57 Cal.2d 57 [17 Cal.Rptr. 369, 366 P.2d 641]. If the latter, all appellant will have accomplished, apparently, is to move $2,099.15 from respondent (i.e., U.S.A.A.) to El Dorado, unless appellant can then assert a claim for attorney fees. Furthermore, to reach the latter result, this court would presumably have to convert the assignment into a constructive partial assignment.

### Unfair Claims Settlement Practice

Appellant commences argument by citing the case of *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329] and suggests that the lien assignment was a practice condemned in *Royal Globe*. As the opinion in that case states, the sole issue before the court was "whether an individual who is injured by the alleged negligence of an insured may sue the negligent party's insurer for violation of [Ins. Code, § 790.03, subd. (h)]." (*Id.*, at p. 884.) An examination of the statute, however, indicates that the assignment of the lien before us is none of the numerous types of practice proscribed. Appellant has provided no case supporting the proposition that section 790.03, subdivision (h) applies to assignments of lien claims of the type in the instant case. And, even if the lien were held to be violative of the statute, we note that *Royal Globe* holds that a plaintiff who asserts an unfair claims settlement complaint against an insurer may not do so in the same lawsuit he brings against the insured. (*Id.*, at p. 891.) Yet this, in effect, is what appellant seeks to do.

### Waiver of Attorney's Fee on Lien Amount

Appellant argues that: "Labor Code Section 3856(b) gives plaintiff an absolute right to reasonable litigation expenses and a 'reasonable attorney's fee' as a reduction of the employer's carrier's lien amount. Although plaintiff's counsel *has in fact* waived *his* right to attorney fees earned in prosecuting this action, and does not seek to renege now and *collect* such fee, defendant's, United Services Automobile Association, Real Party in Interest, purported assigned lien can only be the net amount remaining 'After the payment of such expenses and attorney's fee . . .' Labor Code Section 3856(b)." However, we conclude, first, that his attorney's waiver of a fee on the amount of the lien is not rendered ineffective by section 3856, and, second, the attorney having waived the fee, the statute does not require that the amount which could otherwise have gone to him should now go to appellant. In fact, since the lien amount represents benefits already paid to appellant, to give him a portion of the lien amount would result in a "double recovery" of the type criticized in *Witt* v. *Jackson, supra,* 57 Cal.2d 57.

### Validity of Assignment of the Lien

Appellant attacks the validity of the assignment. In essence, he argues that there is no proof that the persons who signed the assignment were authorized to do so. Apparently, the lower court was satisfied with the validity of the assignment. But assuming its invalidity, what has Quinn lost? Nothing. If the assignment is null and void, then respondent and U.S.A.A. would be entitled to reimbursement for the consideration paid for the "as-

signment" and the lien in the full amount would be asserted by El Dorado or the insurance commission for its creditors. And appellant would receive the same net amount. In any event, this court has no record upon which to evaluate the authority of any of the signatories on the assignment.

Appellant next argues that the instant case should be distinguished from respondent's citations of authority permitting the assignment: *Hone* v. *Climatrol Industries, Inc.* (1976) 59 Cal.App.3d 513 [130 Cal.Rptr. 770]. In the alternative, he argues that *Hone* should be disapproved.[3]

In the *Hone* case, the employee sued the third-party tortfeasor. The employer's worker's compensation carrier filed a complaint in intervention. The carrier then settled with the tortfeasor for $10,000. In exchange, the carrier assigned the employer's lien rights to the tortfeasor and dismissed its complaint in intervention. ■ ■ ■ ■ The effect of this arrangement was to prevent the tortfeasor from raising the issue of the employer's own negligence.[4] After a judgment for plaintiff, and over his objection, the court granted a lien for $81,000 against the judgment. The appellate court upheld the order granting the lien, but reversed the lower court's refusal to award attorney fees to the plaintiff's attorney based on the liened portion of the judgment.

Significantly, in *Hone* it appears that at the time the tortfeasor and employer's carrier brought up the proposed arrangement at an *in camera* hearing, the employee's attorney made no objection. The court held that the employee was *estopped* from asserting the invalidity of the assignment on appeal because the record reflected: "(1) [T]hat counsel for carrier State Fund and third-party Climatrol made a full disclosure of the nature of the settlement agreement including the assignment of the lien and the reasons therefor to the court and plaintiff's counsel; (2) that there is no evidence whatsoever indicating collusion by way of a secret compact or to support a finding of fraud or deceit on the part of either counsel for carrier State Fund or third-party defendant Climatrol; (3) that at no time did plaintiff's counsel object to the agreement and assignment or to the dismissal of the complaint in intervention by the trial court and knew the lien was still on file and its intended use; (4) that apparently plaintiff's counsel derived some benefit from the arrangement since he entered into a stipulation with defense counsel as to the amount of the compensation benefit payments in the sum of $81,307.73 which eased his burden of proof on the element of damages; and (5) plaintiff's counsel registered no objection to the court's instructing

---

[3]No other cases involving assignment of lien rights are cited by the parties.

[4]An employer whose own negligence has contributed to the injury is not entitled to reimbursement. (*Witt* v. *Jackson, supra,* 57 Cal.2d 57, 73.)

the jury on BAJI No. 15.10 that it should determine plaintiff's total damage irrespective of worker's compensation and that the law provides a means by which the rights of the person paying compensation benefits will be protected." (*Hone* v. *Climatrol Industries, Inc., supra,* 59 Cal.App.3d 513, 523.)

■ In the instant case, the record does not suggest that appellant should be estopped, because of at least one significant difference from *Hone*: Here, plaintiff *did* voice objection to what he has always claimed to have been an invalid assignment. However, quite separate from the estoppel principle enunciated by *Hone,* that same case denied the employee's challenge of the assignment and set forth the general rule approving of the assignability of lien claims in these words: "The lien (or, more generally, the right to reimbursement) may be assigned to another party in 'the *Witt* v. *Jackson* indemnification cycle,' the effect of the assignment, however, not being such as to deprive any other party of rights independently held by that other party. [Citations.]" (*Hone* v. *Climatrol Industries, Inc., supra,* 59 Cal. App.3d 513, 523.) *Hone* has, therefore, been cited by one commentator for the broad proposition that "[t]he employer's lien is assignable." (Witkin, Summary of Cal. Law (8th ed., 1982 supp. to vol. 2) Lien on Employee's Judgment, § 31, p. 19.)

In applying *Hone,* and having previously determined the assignment herein has not adversely affected appellant, we conclude "the effect of the assignment . . . [is] not . . . such as to deprive any other party of rights independently held by that other party [i.e., appellant]." (*Hone* v. *Climatrol Industries, Inc., supra,* 59 Cal.App.3d 513, 523.) *Hone* is, therefore, ample precedent for upholding the assignment before us.

*Hone* did not, however, consider the effect of Labor Code section 3859.[5]

Inasmuch as appellant's written consent to the settlement represented by the assignment was not obtained, a literal reading and application of Labor Code section 3859, subdivision (a) would seem to require that we hold the assignment invalid.

Our review of the cases applying this statute indicates that most of them concern settlements between the third-party tortfeasor and the employee,

---

[5]Labor Code section 3859 provides:

"(a) No release or settlement of any claim under this chapter as to either the employee or the employer is valid without the written consent of both. Proof of service filed with the court is sufficient in any action or proceeding where such approval is required by law.

"(b) Notwithstanding any thing to the contrary contained in this chapter, an employee may settle and release any claim he may have against a third party without the consent of the employer. Such settlement or release shall be subject to the employer's right to proceed to recover compensation he has paid in accordance with Section 3852."

rather than between the tortfeasor and the employer (or his insurer). In such cases, the courts have held the purpose of section 3859 is to protect the employer's or his insurer's subrogation rights. (E.g., *Board of Administration* v. *Ames* (1963) 215 Cal.App.2d 215 [29 Cal.Rptr. 917], disapproved on other grounds, *Breese* v. *Price* (1981) 29 Cal.3d 923 [176 Cal.Rptr. 791, 633 P.2d 987]; *Marrujo* v. *Hunt* (1977) 71 Cal.App.3d 972 [138 Cal.Rptr. 220].)

Several of such cases, decided before the 1971 amendment to Labor Code section 3859, dispensing with the previously-required employer's consent to employee-tortfeasor settlements had already expressly or impliedly concluded that the "written consent of both" was *not* required, despite that language of the statute.

Thus, *LaBorde* v. *McKesson & Robbins, Inc.* (1968) 264 Cal.App.2d 363 [70 Cal.Rptr. 726] was a case in which the worker's compensation carrier complained its written consent (on behalf of its employer-insured) had not been obtained concerning the injured worker's settlement with the third-party tortfeasor. The court recited the general proposition that "[t]he law favors the settlement of controversies" and that "Sections 3859 and 3860 envisage only a settlement which covers the totality of claims, general as well as special damages, claims for which the employee has not been compensated and seeks compensation plus claims by the employer for reimbursement for his outlay." (*Id.*, at p. 370.)

*LaBorde* interpreted the statutory purpose of the required written consent of the employer (or its carrier) to be "to insure the non-negligent employer (or his compensation carrier) against a possibility that the employee might pocket a sum representing workmen's compensation benefits and thus jeopardize the employer's subrogated right of reimbursement." (*Ibid.*) Furthermore, in *LaBorde,* "the settlement did not involve any sums in which carrier was interested." (*Id.*, at p. 369.) Thus, the court concluded, the settlement was effective without the written consent of the employer or its carrier, despite Labor Code section 3859.

*LaBorde* also recited that the statutory purpose of the required written consent of the employee "was for the employee's protection against any settlement by which he might become short-changed." (*Id.*, at p. 370.) Although this portion of the decision was dictum, its reasoning is sound and parallels the reasoning and conclusion excusing the need for the written consent of the employer or its insured. *LaBorde* was subsequently denied a hearing by the Supreme Court and later approved in *Brown* v. *Superior Court* (1970) 3 Cal.3d 427, 431 [90 Cal.Rptr. 737, 476 P.2d 105].

We conclude the settlement herein between the respondent and El Dorado was valid, notwithstanding the lack of presettlement notice to appellant (per Labor Code section 3860) and notwithstanding the lack of his written consent (per Labor Code section 3859). Plaintiff was in no way adversely affected by that settlement.

### Effect of Collateral Source Rule

Plaintiff then argues that: "It is one thing to uphold the lien claim rights of the compensation insurer in third party litigation, under the Labor Code provisions, but it is quite another thing to allow a transfer of those rights at bargained for prices to defendant's insurer who occupies the position in opposition to plaintiff's recovery at all. It seems that a reasoning for the collateral source rule (or independent source of benefits rule) which has been case law since *Anheuser-Busch, Inc.* v. *Starley,* 28 Cal.2d 347 should, in principle, preclude defendant's insurer from taking unfair advantage of plaintiff through the purchase at discount values of the workmens [*sic*] compensation lien."

 We conclude that there is no basis for invoking the collateral source rule, inasmuch as under the worker's compensation law, an employer who has paid benefits to the employee has a lien on whatever the employee obtains from the third party, unless he files his own action against the third party. Further, in circumstances involving a contributorily negligent employer, the third party is entitled to a reduction of the employee's judgment equal to the amount of benefits paid.

### Public Policy Considerations

Appellant next cites *Witt* v. *Jackson, supra,* 57 Cal.2d 57. That case held that where the employer is negligent and therefore not entitled to a lien on the judgment obtained by the employee against a third-party tortfeasor, the judgment must be reduced by the amount of the benefits paid to the employee. The rationale for this rule is to preclude a double recovery for the employee.

Appellant argues that in the instant case the third party (respondent) is getting a "double recovery" by virtue of the lien assignment, and that the *Witt* rule should be extended to prohibit such recovery.

It is unclear how whatever respondent's insurer (U.S.A.A.) got can be characterized as a "double recovery." Possibly, appellant is suggesting that just as *Witt* prevents the employee from getting more than that to which he

is entitled, so too should *Witt* prevent a third-party tortfeasor from paying less than that to which he is obligated.

More likely, appellant's point is that had he, himself, purchased the lien at a discount, he would be getting a "double recovery," at least to the extent the consideration given for the lien was less than its face amount. Such a "double recovery" to the employee would presumably violate the rule in *Witt*. Therefore, if the purchase by an employee of a lien, at a discount, is a violation of *Witt*, so too should purchase of a lien by the third-party be considered a violation of *Witt*.

In any event, the point is not well taken. Although, in retrospect, defendant and U.S.A.A. made an advantageous arrangement with El Dorado, at the time the lien was purchased its value was speculative. Nor was there any certainty that there would be a judgment against which the lien could be imposed.[6]

Furthermore, to the extent that respondent has obtained something at a price less than what it is worth, he has done so at the expense of El Dorado or its creditors. In this regard, appellant lost nothing. To give respondent credit against the judgment only for the amount paid for the lien means giving the difference to appellant which, in itself, violates the rule in *Witt*.

Appellant then argues that to permit a credit in the full amount of the lien will result in appellant not receiving even the equivalent of his lost wages. Although such a result, if it occurs, has practical significance to appellant and his attorney, there is obviously no legal requirement that any litigant make a net recovery more or less than the amount of any particular element of his special damages. Furthermore, a review of the record indicates that, if appellant does realize less than his wage loss, the cause will have been the payment of attorney's fees from his share of the judgment, as calculated

---

[6]*Appellant points to the arbitration award, which was in the amount of $18,308.30, and argues that a determination of liability and (by inference) a judgment in excess of $4,000 were certain to result from trial. Thus (by implication), the judgment was something more than a mere expectancy.*

However, this court is not in a position to ascertain how likely it was that a plaintiff's judgment would be obtained. Even if it were, it would be unwise to fashion a rule pertaining to assignments of liens which is based, in part, on the result of such a determination. We note also that if unfair advantage was taken of anyone, it was of El Dorado and not of appellant.

by his attorney.[7] Except for cases of the type in which provision has been made for the losing litigant to pay, the very nature of attorney fee arrangements (contingent, hourly, or otherwise) presupposes that an appellant will have to pay out of his recovery his attorney's fees and will thus net less than that to which he is "entitled."

Appellant's next point is that, by virtue of the assignment, El Dorado's creditors were "robbed" of $2,099.15. However, at the time of the assignment the value of the lien claim depended on a yet-to-be-rendered judgment. A 50 percent recovery on a claim based on what can be characterized as a mere expectancy is not necessarily a case involving larceny. Even if it is, neither El Dorado's creditors nor the insurance commissioner has been

---

[7]In this connection, it appears that his counsel has made several mathematical errors resulting in a significant misstatement to this court (as well as to the lower court) of the amount of appellant's net recovery if we affirm the order. We point out these apparent errors so that appellant's attorney will have an opportunity to consider revision of his fee accordingly.

One of the more serious of these errors is a $1,000 error in subtraction committed when actual costs were subtracted from the total judgment. Given the 40 percent contingent fee agreement to which his attorney makes reference, this error overstates the attorney fees by $400 and thus understates appellant's net recovery.

Another apparent error arises from the method by which the attorney fees are calculated vis-à-vis the liened portion of the judgment. Ordinarily, when an employer does nothing more than file a claim of lien against an anticipated judgment, a portion of the employer's share of the recovery is deducted as and for attorney fees. (*Quinn* v. *State of California* (1975) 15 Cal.3d 162 [124 Cal.Rptr. 1, 539 P.2d 761].) The employee's attorney can recover attorney fees from the liened portion of the judgment even where the lien has been assigned to the third party. (*Hone* v. *Climatrol Industries, Inc., supra*, 59 Cal.App.3d 513, 530-531.)

In the instant case, at the *in camera* hearing prior to the taking of testimony, appellant's attorney agreed "not [to] seek in this action or otherwise to obtain attorney fees for the proving and establishing and collection of the lien claim." At the same discussion he stated "I'm not going to ask the court to award any attorney fees under the Quinn case [*ante*] by reason of proof of wage loss or proof of medical payments . . . ." In his closing brief, appellant states: "Plaintiff . . . was forced to waive attorney fees under [*Quinn, supra*] in the in chambers bargaining session to persuade the Court to keep the fact of disability payment made by Transamerica [*sic*] Insurance Co. from the ears of the jury." He also states: "Although plaintiff's counsel *has in fact* waived *his* right to attorney fees earned in prosecuting this action, and does not seek to renege now and *collect* such fee . . . ."

However, in arriving at the figure he identifies as "plaintiff's net recovery," appellant's attorney has calculated his fees based on the entire judgment, *including* the $4,198.30 portion subject to the lien. Assuming he did not intend to waive the fee as to the lien claimant only to impose it on his own client, and given the 40 percent contingent fee arrangement mentioned in the declaration, this results in another overstatement of the attorney fees, this time by $1,679.32 (40 percent of $4,198.30).

With reference to the waiver of attorney's fee, we note that pursuant to Labor Code section 3855, a "waiver" was probably not necessary in order to keep out the fact that disability payments had been made. That section provides: "If the employee joins in or prosecutes such action, either the evidence of the amount of disability indemnity or death benefit paid or to be paid by the employer or the evidence of loss of earning capacity by the employee shall be admissible, but not both. Proof of all other items of damage to either the employer or employee proximately resulting from such injury or death is admissible and is part of the damages."

heard to complain. And if either were to do so, this action is not the appropriate forum in which to resolve the matter.

Appellant next contends that there arises a conflict of interest by virtue of the assignment, because U.S.A.A. "has take[n] an assignment of that right of indemnity [i.e., El Dorado's] against itself." It is unclear what is the nature of this conflict of interest. As a defendant against the claim, respondent still had an inducement to oppose appellant's lawsuit. As assignee of the lien claim, he probably had no greater interest in the proceeding, whereas had there been no assignment, El Dorado would have hoped for a plaintiff's judgment at least equal to the lien amount.

As his final public policy argument, appellant contends that permitting third parties to purchase employer lien claims will inhibit settlements between employees and third parties and should be declared against public policy. The reason: A defendant will have "excess credit to offset a verdict [and] will be less inclined to make a reasonable offer before trial." And, "the plaintiff will be more likely to gamble in the face of an unreasonable offer." Depending upon the comparative amounts of numerous variables, including compensation benefits paid, income lost, and the discount at which the tortfeasor can purchase the compensation lien, we can conceive of cases in which settlement negotiations might be inhibited.

Plaintiff, however, cites no authority for this proposition. We have found none.

There is, however, abundant support for upholding settlements of lien claims, as illustrated by a number of the decisions reviewed in this opinion. We conclude also that most such settlements are likely to reduce litigation, rather than add to it. We decline, therefore, to pronounce a new rule of public policy in this case, under circumstances in which appellant has not been adversely affected.

We affirm the order granting the lien.

Newsom, Acting P. J., and Breiner, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.